J-S15015-25

2025 PA Super 171

| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1248 WDA 2024 |

Appeal from the Dispositional Order Entered September 5, 2024
In the Court of Common Pleas of Somerset County Juvenile Division at
No(s): CP-56-JV-0000015-2022

BEFORE: OLSON, J., SULLIVAN, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY OLSON, J.: **FILED: AUGUST 7, 2025**

Appellant, A.M., appeals from the order of disposition entered on September 5, 2024, following his delinquency adjudication for 28 acts constituting violations of the Game and Wildlife Code.[1] We vacate the order that denied Appellant's speedy trial claim and remand.[2, 3]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Specifically, the Juvenile Court adjudicated Appellant delinquent for the following acts: 15 counts of unlawful killing or taking of big game (34 Pa.C.S.A. § 2321(a)(1)); eight counts of unlawful use of lights while hunting (34 Pa.C.S.A. § 2310(a)(2)); and, five counts of unlawful taking or possession of game or wildlife (34 Pa.C.S.A. § 2307(a)).

[2] We note with dismay that the Commonwealth failed to file a brief in this case.

[3] The Commonwealth Court has "exclusive jurisdiction of appeals from final orders of the courts of common pleas" in certain cases, including "[a]ll criminal actions or proceedings for the violation of any . . . [r]egulatory statute
*(Footnote Continued Next Page)*

On March 10, 2022, a written allegation was submitted against Appellant, alleging that Appellant committed numerous delinquent acts in violation of the Game and Wildlife Code. **See** Written Allegation, 3/10/22, at 1-9. Counsel was appointed to represent Appellant and, on May 25, 2022, the Somerset County Juvenile Probation Department ("Probation

---

administered by any Commonwealth agency subject to Subchapter A of Chapter 5 of Title 2 (relating to practice and procedure of Commonwealth agencies)." 42 Pa.C.S.A. § 762(a)(2)(ii). Thus, as we have held, "[t]he Commonwealth Court [] is conferred with jurisdiction over appeals from criminal prosecutions brought pursuant to the Game and Wildlife Code." **Commonwealth v. Gosselin**, 861 A.2d 996, 999 n.2 (Pa. Super. 2004).

Although the case at bar concerns violations of the Game and Wildlife Code, the appeal does not fall under the Commonwealth Court's jurisdiction, as the case proceeded under the Juvenile Act – and was not a "criminal action or proceeding." **See**, **e.g.**, 42 Pa.C.S.A. § 6322(a) (differentiating a proceeding under the Juvenile Act from a "criminal proceeding"); **In re S.A.S.**, 839 A.2d 1106, 1109 (Pa. Super. 2003) ("juvenile proceedings are not criminal proceedings"); **see also In re R.A.**, 761 A.2d 1220, 1224 (Pa. Super. 2000) ("[u]nder the Juvenile Act, juveniles are not charged with crimes; they are charged with committing delinquent acts. They do not have a trial; they have an adjudicatory hearing. If the charges are substantiated, they are not convicted; they are adjudicated delinquent. Indeed, the Juvenile Act expressly provides an adjudication under its provisions is not a conviction of crime. 42 Pa.C.S.A. § 6354(a). These are not insignificant differences or the transposing of synonyms. The entire juvenile system is different, with different purposes and different rules") (quotation marks, paragraphing, and some citations omitted).

Further, and regardless, neither party has challenged our appellate jurisdiction. Thus, we have jurisdiction to consider the merits of this appeal. **See** Pa.R.A.P. 741(a) ("[t]he failure of an appellee to file an objection to the jurisdiction of an appellate court on or prior to the last day under these rules for the filing of the record shall, unless the appellate court shall otherwise order, operate to perfect the appellate jurisdiction of such appellate court, notwithstanding any provision of law vesting jurisdiction of such appeal in another appellate court"); **see also Gosselin**, 861 A.2d at 999 n.2.

Department") filed a delinquency petition against Appellant, which essentially repeated the acts described in the written allegation. *See* Delinquency Petition, 5/25/22, at 1-6.

An adjudicatory hearing on the matter was originally scheduled for June 9, 2022. *See* Juvenile Court Order, 6/15/22, at 1. That day, however, the Juvenile Court issued an order continuing the hearing generally, as it concluded that "extensive discovery will be necessary prior to the [adjudicatory] hearing." *See id.* The Juvenile Court's order further declared that Appellant expressly "waived any specific time requirements for the scheduling and conducting of [the adjudicatory] hearing." *See id.*

Following the June 9, 2022 order, the Juvenile Court scheduled an adjudicatory hearing for January 5, 2023. *See* Summons, 12/22/22, at 1. This hearing was, however, continued, as was the later-scheduled hearing for November 30, 2023. *See* Juvenile Court Order, 1/5/23, at 1-2; Juvenile Court Order, 11/30/23, at 1-2. The relevant orders provide no explanation for the continuances.

On July 10, 2024, the Probation Department requested that the Juvenile Court schedule an adjudicatory hearing for August 27, 2024 and, on July 12, 2024, the Juvenile Court entered an order, scheduling the adjudicatory hearing for the requested date. *See* Juvenile Court Order, 7/15/24, at 1.

At the beginning of the August 27, 2024 hearing, Appellant moved to dismiss the petition, based upon an alleged violation of his Sixth Amendment

right to a speedy trial.[4]  **See** N.T. Adjudicatory Hearing, 8/27/24, at 4.

Appellant argued:

> We would submit that [Appellant] indicated at least by
> January of 2023 that he was asking for a contested hearing,
> a contested finding of fact in this matter.  We are not sure of
> any reason for delay in the trial from that time period.
> [Appellant] is asserting the right both by asking for a finding
> of fact and by this motion today.  And as far as prejudice to
> [Appellant], we would respectfully submit that [Appellant's
> birthdate is of record and that Appellant] turns 21 [years old]
> in September of this year[.  A]nd we submit to the court that
> in the event that he is adjudicated delinquent and there is a
> disposition on some or all of these offenses that [Appellant]
> would have less than a month before, by virtue of turning 21,
> any fines associated with these offenses would be
> presumably become a probation judgment against him, and
> any court costs for that matter; and if the primary purpose
> of juvenile delinquency is rehabilitation, he would not have
> been able to avail of any rehabilitation from being on
> probation any significant length of time prior to presumably
> facing relatively significant judgments.

*Id.* at 4-5.

During oral argument on Appellant's motion, the Commonwealth

provided no explanation for its delay in scheduling the adjudicatory hearing.

*Id.* at 6-7.  Nevertheless, the Juvenile Court denied Appellant's motion.  **See**

*id.* at 9.

During the adjudicatory hearing, the Commonwealth first presented the

testimony of Pennsylvania State Game Warden Sergeant Brian Witherite.  *Id.*

---

[4] Appellant was neither in custody nor subject to monitoring prior to the
adjudicatory hearing.

- 4 -

at 11. As Sergeant Witherite testified, on November 18, 2020 he received information that:

> there was an ongoing poaching activity taking place outside of Confluence on Colflesh Road, which sits off of State [Route] 281 southbound. . . . It's a very remote dirt road system, a couple of farms, but a lot of agricultural is on that road.
>
> There was a witness chasing a motorized vehicle that was fleeing his property and reported the [Pennsylvania vehicle] registration and related that to the County 911 Center, which was forwarded to our dispatch. I was activated to go out to investigate and that started the investigation.

*Id.* at 13.

Sergeant Witherite testified that the identified vehicle was registered to an individual named Caleb Roland, an adult. Sergeant Witherite met with Mr. Roland and, during an interview, Mr. Roland told the sergeant that, on November 18, 2020, he was driving the vehicle and that he and his passengers "were on that road to poach an antlered whitetail deer." *Id.* at 15. Mr. Roland later took Sergeant Witherite to various locations where he and his passengers had, from October until November 18, 2020, shot, killed, and left to decompose whitetail deer. *See id.* at 25-56. Sergeant Witherite testified that, during his investigation, Mr. Roland disclosed the carcasses of 19 poached deer. *Id.* at 60. Further, the sergeant testified his investigation revealed that Mr. Roland and his passengers had shot and wounded numerous other deer "that were not retrieved." *Id.* The sergeant testified that all 19 of the deer he identified were shot and killed "outside of the daily seasons and bag limits." *Id.* at 62.

Mr. Roland testified at the hearing. According to his testimony, he, Appellant, and a second juvenile named D.S., were poaching deer from "like October [2020] to the day we got caught, which was November 18[, 2020]." *Id.* at 130. Mr. Roland testified that, on each poaching trip, "[Appellant] and [D.S.] were always with me." *Id.* at 146.

As Mr. Roland testified, on the night of November 18, 2020, he, Appellant, and D.S. "went out poaching." *Id.* at 130-131. He testified:

> [On the night of November 18, 2020, w]e went onto Colflesh Road, and we turned around at this farmer's house because we saw a big buck in the field, not too far away from . . . his house, so we turned around, like I would say not even a quarter mile up the road from his house. [Appellant] was sittin' right next to me, . . . and I was driving, and . . . [D.S.] was in the back; and then [Appellant] had his [300 Winchester Magnum Rifle ("300 Win Mag")] . . . sittin' with him while [D.S.] had the .22 in the back. [Appellant's] gun clicked; [D.S.] took the shot; it looked like the buck went down; and the next thing I knew, we were getting chased by the farmer in a Dodge Ram truck and then we went.

*Id.* at 131.

Mr. Roland testified that Appellant's gun "clicked" that night because "[h]e had it on safety. It did not go off. . . . [Although h]e did attempt to take the shot." *Id.* at 132. Further, Mr. Roland testified that, after Appellant's gun failed to fire, Appellant held the spotlight on the deer and that this act allowed D.S. to shoot the deer. *Id.* at 131-132 and 159.

Mr. Roland testified that, prior to this night, he, Appellant, and D.S. "went out poaching . . . almost every weekend from the beginning of October

[2020]" until they were caught in November 2020. *Id.* at 133. Mr. Roland testified that the first time he, Appellant, and D.S. went poaching:

> there was a 10-point [buck], a 12-point [buck,] and two does, and [Appellant] and [D.S.] were going off on them . . . [j]ust – basically just spraying and spraying [bullets] on those [deer] just to see if they [could] get any deer down.

*Id.* at 134-135.

Mr. Roland testified that they hit at least two of the deer with bullets, "because [the deer] really did jump," but that they could not collect any of the deer they shot that night, as the deer ran away. *Id.* at 136. Mr. Roland also testified that, later in the night, they drove to a different location, where he "took a shot at a doe or two," but missed his shots. *Id.*

Mr. Roland testified that the group went out the next weekend and, during the night, D.S. shot at a group of deer on a hill, with Appellant holding the spotlight. *Id.* at 137. Mr. Roland testified that he did not think that any of the deer were hit by the bullets that night, as the "gun was shootin' six inches off to the right." *Id.*

As Mr. Roland testified, on the next weekend, at approximately 4:30 a.m., Appellant "poached an 8-point buck, which there is a picture of." *Id.* at 138. Mr. Roland testified that Appellant shot and killed the buck with a .22 caliber rifle "and then later that day, [Appellant] used [a] bow and arrow and shot it [again] . . . to make it look like it got shot by a bow and arrow instead of a .22." *Id.* at 140-141.

As Mr. Roland testified, "later that day," he, Appellant, and D.S. were driving when "a family of four deer walked out in front of us." *Id.* at 141. He testified:

> [Appellant and D.S.] told me to stop the truck, so I stopped the truck[. T]hey got out[,] not took but a few steps on the road[,] and [Appellant and D.S.] had their guns, and my .22 was not at the scene[.] I know the 300 Win Mag was and [D.S.] had his high-powered rifle; and if one missed, the other one hit. So they wiped that whole family of four deer out, and we loaded them – they loaded them up onto the truck, and then we took them back to [D.S.'s house].

*Id.* at 142.

Further, that same day, they were together when D.S. shot two additional deer. *Id.* at 144. Mr. Roland testified: "we did take [one of those deer], and the other was bagged and [we] left it" where it was. *Id.*

Mr. Roland testified that they did not go out on Halloween weekend. However, Mr. Roland testified, on the ensuing weekend, they "went to Somerset behind my Pap's and saw a group of . . . about 10 deer in a herd . . . and [Appellant and D.S.] just laid it off, just started spraying them down" with bullets. *Id.* at 145. He testified that Appellant and D.S. "took turns" shooting the deer, while he held the spotlight. *Id.* Further, he testified that "at least two [deer were] hit [because the deer] jumped when hit." *Id.*

Mr. Roland testified that, from October until November 18, 2020, "the highest [number of deer] we shot at [in one night] would be 10 to 12 . . . , injured or – or – you know, we missed." *Id.* at 146. He testified that they

processed and ate a number of the deer they killed, but that they dumped "at least 11 or 12 deer" at a dump site. *Id.* at 148-149.

D.S., a juvenile, also testified for the Commonwealth at the hearing. D.S. testified that, on November 18, 2020, he was in a vehicle with Mr. Roland and Appellant. *Id.* at 101. On that date, Mr. Roland was driving the car, D.S. was sitting in the passenger seat holding a rifle, and Appellant was sitting in another passenger seat holding a spotlight to identify deer. *Id.* at 101-102. As D.S. testified, on November 18, 2020, he "shot a deer out the [car] window . . . and the farmer chased us and got our license plate." *Id.* at 101.

D.S. testified that, prior to this event, he and Mr. Roland went out "maybe four to seven" times to spot or shoot deer and Appellant accompanied them "most of the time[.]" *Id.* at 102. As D.S. testified, he was the primary shooter during these events. *Id.* at 103. However, D.S. testified that Mr. Roland shot at least two of the deer and Appellant "shot maybe one" deer. *Id.* at 103-104. He further testified that, "on several occasions," Appellant acted as the deer spotter. *Id.* D.S. testified that he, personally, shot at "[a]round 10, 15, 20" deer and actually hit "[h]alf of them." *Id.* at 111.

After hearing the testimony, the Juvenile Court concluded that Appellant committed the delinquent acts alleged in the petition and, on September 5, 2024, the Juvenile Court adjudicated Appellant delinquent. *See* N.T. Hearing, 9/5/24, at 19. In its order of disposition, the Juvenile Court ordered that Appellant be placed on probation until the time he turned 21 years old and pay $30,000.00 in fines and restitution. *Id.* at 19-21. Further, the Juvenile

Court ordered that Appellant's hunting and trapping privileges be suspended for 50 years. *Id.* at 21.

Appellant filed a timely notice of appeal. He raises two issues to this Court:

> 1. Whether the Juvenile Court erred by substantiating and ultimately adjudicating [Appellant] delinquent of [28] counts under the Game and Wildlife Code, where the substantiation and adjudication of delinquency relative to said offenses was against the weight of the evidence presented at [Appellant's] finding of fact hearing?
>
> 2. Whether the Juvenile Court erred [in] twice denying [Appellant's] motions to dismiss for violation of his constitutional right to a speedy trial[?]

Appellant's Brief at 5.[5]

First, Appellant claims that his delinquency adjudication was against the weight of the evidence, as "the Juvenile Court's reliance on [Mr.] Roland's testimony to substantiate and adjudicate [Appellant] delinquent on [28] separate offenses under the Game and Wildlife Code [was] a palpable abuse of discretion." *See id.* at 45 and 36-45. This claim is waived, as Appellant did not raise the claim with the Juvenile Court.[6] *See* Pa.R.J.C.P. 415(A) and

---

[5] For ease of discussion, we have renumbered Appellant's claims on appeal.

[6] During the September 5, 2024 adjudicative hearing, Appellant made the following oral motion to the Juvenile Court:

> [Appellant moves] for the [Juvenile Court] to reconsider its [order] substantiating the allegations in this matter based on [Appellant's] assertion that his prior counsel failed to raise issues with the Commonwealth's witnesses and whether or not they were on

*(Footnote Continued Next Page)*

cmt. ("[t]he purpose of [Rule 415] is to make it clear that a challenge to the weight of the evidence must be raised with the juvenile court judge or it will be waived").

Next, Appellant claims that the Juvenile Court erred when it denied his motion to dismiss, based upon an alleged violation of his Sixth Amendment right to a speedy trial or adjudicative hearing. *See* Appellant's Brief at 23.

"In evaluating speedy trial issues, our standard of review is whether the trial court abused its discretion, and our scope of review is limited to the trial court's findings and the evidence on the record, viewed in the light most favorable to the prevailing party." *Commonwealth v. Wholaver*, 989 A.2d 883, 899 (Pa. 2010). "Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will."

_____

psychedelics at the time of the alleged incidents, which would obviously cut to credibility.

N.T. Hearing, 9/5/24, at 8-9.

This motion questions the effectiveness of Appellant's prior counsel and whether the Commonwealth's witnesses should have been believed, as "they were on psychedelics at the time of the alleged incidents," but it does not assert a claim that "the Juvenile Court's reliance on [Mr.] Roland's testimony to substantiate and adjudicate [Appellant] delinquent on [28] separate offenses under the Game and Wildlife Code [was] a palpable abuse of discretion." *See* Appellant's Brief at 45. Therefore, the weight claim Appellant currently raises on appeal is waived. *See* Pa.R.J.C.P. 415(A).

*Commonwealth v. Jeter*, 296 A.3d 1187, 1192 (Pa. Super. 2023) (quotation marks and citations omitted). "A [determination] by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion. Where the record adequately supports the trial court's reasons and factual [assessments], the court did not abuse its discretion." *Id.* (quotation marks and citations omitted). Importantly, however, "an error of law constitutes an abuse of discretion." *Commonwealth v. Akrie*, 159 A.3d 982, 988 n.6 (Pa. Super. 2017); *see also Temple Estate of Temple v. Providence Care Ctr., LLC*, 233 A.3d 750, 764 (Pa. 2020) ("[i]n addition to legal error, an abuse of discretion occurs where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will") (quotation marks and citations omitted).

As Pennsylvania Rule of Juvenile Court Procedure 404(B) provides, where "the juvenile is not detained, the adjudicatory hearing shall be held within a reasonable time." Pa.R.J.C.P. 404(B). In *Commonwealth v. Dallenbach*, 729 A.2d 1218 (Pa. Super. 1999), this Court recognized that the prompt trial rule, contained in the Pennsylvania Rules of Criminal Procedure, does not apply to juvenile proceedings. *Commonwealth v. Dallenbach*, 729 A.2d 1218, 1219 (Pa. Super. 1999); *see also* Pa.R.Crim.P. 100 ("[u]nless otherwise specifically provided, [the Rules of Criminal Procedure] shall not apply to juvenile or domestic relations proceedings"); *Commonwealth v. Sloan*, 907 A.2d 460, 468 (Pa. 2006) ("while Rule 600 generally protects a defendant's right to a speedy trial, there is no constitutional significance to

the number of days or the procedure chosen by the [Pennsylvania Supreme] Court in enacting [Rule 600]"). Nevertheless, **Dallenbach** held that "the due process clause of the 14th Amendment makes applicable to juveniles a 6th Amendment speedy trial right in delinquency proceedings." **Dallenbach**, 729 A.2d at 1222. Further, **Dallenbach** held that, in determining whether a juvenile has been deprived of this right, a court must employ the balancing test stated in **Barker v. Wingo**, 407 U.S. 514 (1972), and must weigh the following four, related factors: 1) the length of the delay; 2) the reason for the delay; 3) the juvenile's assertion of his right; and, 4) the prejudice to the juvenile. **Dallenbach**, 729 A.2d at 1222; **see also Barker v. Wingo**, 407 U.S. 514 (1972).

**Barker** concerned an adult murder trial. In its opinion, the United States Supreme Court formulated a balancing test that courts must apply when determining whether a defendant's constitutional right to a speedy trial has been violated. As the **Barker** Court initially explained:

> A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

**Barker**, 407 U.S. at 530.

Moreover, the **Barker** Court provided some guidance as to how a court should consider the four, relevant factors:

The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.

Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

. . . Whether and how a defendant asserts his right [to a speedy trial] is closely related to the other factors we have mentioned. The strength of [the defendant's] efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. [The United States Supreme] Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the

accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Barker*, 407 U.S. at 530-532 (footnotes omitted).

The *Barker* Court emphasized that "none of the four factors identified above [are] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533.

In this case, Appellant moved, at the beginning of the adjudicatory hearing, to dismiss the delinquency petition, based upon an alleged violation of his Sixth Amendment right to a speedy trial. As is relevant to the current appeal, Appellant's pre-hearing claim asserted that a lengthy, unjustified delay caused him to suffer prejudice because he would turn 21 years old less than one month after the hearing – thus thwarting the rehabilitative purpose behind the Juvenile Act and the delinquency proceedings. *See* N.T. Adjudicatory Hearing, 8/27/24, at 4-5; *see also* Appellant's Brief at 30. The Juvenile Court denied Appellant's motion and, in its opinion to this Court, the Juvenile Court held that Appellant's argument failed as a matter of law

because Pennsylvania does not recognize Appellant's claim of prejudice.[7] **See** Trial Court Opinion, 12/4/24, at 4.

On appeal, Appellant generally claims that the Juvenile Court erred in weighing the factors relevant to his speedy trial claim and Appellant specifically claims that the Juvenile Court erred as a matter of law in concluding that "Pennsylvania jurisprudence does not hold that losing any rehabilitative benefits of probation and facing civil judgment for fines, costs, and restitution owed is not the type of prejudice that makes proceedings fundamentally unfair to a juvenile." Appellant's Brief at 33 (quotation marks and corrections omitted). We agree with Appellant and respectfully conclude that the Juvenile Court erred as a matter of law when it held that Appellant's claim of prejudice was insufficient under Pennsylvania law. Thus, we remand this case to the Juvenile Court so that it may, in the first instance, consider Appellant's claim of prejudice and weigh the relevant factors to assess Appellant's speedy trial claim. Our analysis begins with applying the facts of this case to the four **Barker** factors. As explained above, these factors are: 1) the length of the delay; 2) the reason for the delay; 3) the juvenile's assertion of his right; and, 4) the prejudice to the juvenile. **Dallenbach**, 729 A.2d at 1222; **see also Barker**, 407 U.S. at 514.

---

[7] Recall that Appellant's claim of prejudice centered upon the contention that the brief period between the September 5, 2024 dispositional order and his 21st birthday later in September allowed too little time to benefit from rehabilitative supervision. **See** N.T. Adjudicatory Hearing, 8/27/24, at 4.

Here, the juvenile delinquency proceeding against Appellant commenced on March 22, 2022, when the written allegation was submitted against Appellant. *See* Pa.R.J.C.P. 200(1) ("[j]uvenile delinquency proceedings within a district shall be commenced by . . . submitting a written allegation pursuant to Rule 231"). Appellant's adjudicatory hearing did not occur until August 27, 2024. This constitutes a delay of 901 days (or, 29 months and 17 days) from the time the juvenile delinquency proceedings against Appellant commenced until the time of Appellant's adjudicatory hearing. In the language of *Barker*, the lengthy delay in this case is "presumptively prejudicial," thus necessitating further "inquiry into the other factors that go into the balanc[ing test]." *See Barker*, 407 U.S. at 530; *c.f.* Pa.R.Crim.P. 600(A)(2) (providing the general rule that trial in an adult criminal case must commence within 365 days from the date on which the criminal complaint is filed against the defendant).

We reach this conclusion as to the first speedy trial factor in view of the particular circumstances before us, the guidance offered in *Barker*, and a prior decision of this Court. *Barker* characterized length-of-delay as a trigger mechanism, noting that "because of the imprecision of the right to speedy trial, the length of [a constitutionally intolerable] delay that will provoke [further] inquiry is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530. In *Dallenbach*, a **total** of 18 months elapsed from the commencement of the delinquency proceedings until the adjudicatory hearing. *See Dallenbach*, 729 A.2d at 1218-1219. The

*Dallenbach* panel labeled the length of this delay "extraordinary" and reasoned:

> We are aware of no case where a due process right in a juvenile case was recognized or in which the juvenile in a delinquency proceeding received less consideration than an adult in a criminal case of similar circumstances. In a case where, without justification, a person charged with a crime as an adult, who through no fault of his own, is not brought to trial within 365 days (when not incarcerated), or 180 days (when incarcerated), . . . he is entitled to dismissal of the charges. Here, the unjustified delay was one and one-half [] years, more than 540 days.

*Id.* at 1225. Given our observation in *Dellenbach* and the delay in proceeding to Appellant's adjudicatory hearing, an assessment of *Barker*'s additional three factors must be undertaken here.

Regarding the "reason the government assigns to justify the delay," we note that, on June 9, 2022, the Juvenile Court continued, generally, the proceedings against Appellant because "extensive discovery will be necessary prior to the [adjudicatory] hearing." Juvenile Court Order, 6/15/22, at 1. Further, within its order, the Juvenile Court noted that Appellant "waived any specific time requirements for the scheduling and conducting of [the adjudicatory] hearing." *See id.*

As Appellant correctly notes, however, from January 5, 2023 onward, the proceedings were continued without his express consent and for no articulated reason given by the Commonwealth. *See* N.T. Adjudicatory Hearing, 8/27/24, at 4 (Appellant argued: "[w]e would submit that [Appellant] indicated at least by January of 2023 that he was asking for a

contested hearing, a contested finding of fact in this matter.  We are not sure of any reason for delay in the trial from that time period"); **see also** N.T. Adjudicatory Hearing, 8/27/24, at 6-7 (the Commonwealth provided no explanation for the delay during argument on Appellant's speedy trial motion); Juvenile Court Order, 1/5/23, at 1-2 (providing no reason for the continuance); Juvenile Court Order, 11/30/23, at 1-2 (providing no reason for the continuance).

In its opinion, the Juvenile Court noted that Appellant's case was complicated by the fact that "there were four other individuals involved in this case charged with delinquent or criminal behavior and numerous incidents were involved."  Juvenile Court Opinion, 12/4/24, at 4; **see also** N.T. Adjudicatory Hearing, 8/27/24, at 8.  Nevertheless, there were 600 days of essentially unexplained delay from January 5, 2023 until the adjudicatory hearing of August 27, 2024.  This constitutes over 19 months of delay without exposition from the Commonwealth.

Regarding the third factor, Appellant asserted his right to a speedy trial in a timely fashion, by orally moving for the dismissal of the petition at the beginning of the adjudicatory hearing.  **See** N.T. Adjudicatory Hearing, 8/27/24, at 4-5; **see also** Pa.R.J.C.P. 344(A) ("[a]ll motions and answers shall be made orally on the record or in writing"); Pa.R.J.C.P. 344 cmt. ("oral motions and answers are permitted because of the emphasis on prompt disposition in Juvenile Court").

The fourth and final ***Barker*** factor concerns prejudice to the juvenile. As noted above, in this case, Appellant claimed that the Commonwealth's unjustified delay prejudiced him because he turned 21 years old shortly after the adjudicatory hearing and, thus, the delay caused him to lose substantial rehabilitative benefits from the juvenile system. ***See*** N.T. Adjudicatory Hearing, 8/27/24, at 4-5. The Juvenile Court denied Appellant's claim because, it concluded, "Pennsylvania jurisprudence does not hold that [the loss of rehabilitative benefits] is the type of prejudice that makes proceedings fundamentally unfair to a juvenile." Juvenile Court Opinion, 12/4/24, at 4. We conclude that the Juvenile Court erred in this regard.

It is true that, in ***Dallenbach***, this Court held a juvenile's Sixth Amendment speedy trial claim must be analyzed in accordance with ***Barker's*** four-factor balancing test. Further, in ***Barker***, the United States Supreme Court held that the "prejudice" factor

> should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. [The United States Supreme] Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.

***Barker***, 407 U.S. at 532.

Read strictly, neither ***Barker*** nor ***Dallenbach*** expressly hold that the loss of rehabilitative benefit can support a juvenile's Sixth Amendment speedy trial claim. It must be remembered, however, that ***Barker*** was not a juvenile case. Thus, the ***Barker*** Court was not called upon to identify interests that

- 20 -

specifically apply to juveniles. Further, in **Dallenbach**, the juvenile defendant claimed that the delay caused him prejudice because his witness was "now unavailable to testify." **See Dallenbach**, 729 A.2d at 1222. This claim squarely implicates the third prejudicial interest identified by **Barker**, as the loss of the witness impaired Dallenbach's defense. **See Barker**, 407 U.S. at 532 (identifying "impairment of the defense" as an interest "which the speedy trial right was designed to protect"). Thus, the **Dallenbach** panel also did not have the opportunity to expound upon the unique form of prejudice alleged here.

As the District of Columbia Court of Appeals declared: "[a]lthough the [**Barker**] factors used in evaluating speedy trial claims for criminal defendants are instructive, for purposes of consideration of a claim of a juvenile in a delinquency proceeding, they must be considered and applied in a manner which is consistent with the goals and purposes of our juvenile system." **In re D.H.**, 666 A.2d 462, 473 (D.C. 1995). To be sure, we have held that "the juvenile court system is markedly different from the criminal court system." **In re J.B.**, 39 A.3d 421, 426 (Pa. Super. 2012). Importantly, "[t]he purpose of juvenile proceedings is to seek treatment, reformation and rehabilitation, and not to punish." **Id.** at 427; **see also** 42 Pa.C.S.A. § 6301(b)(2) (declaring that one of the purposes of the Juvenile Act is "to provide for children committing delinquent acts programs of supervision, care and rehabilitation which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of

competencies to enable children to become responsible and productive members of the community"); ***In re Iafrate***, 594 A.2d 293, 295 (Pa. 1991) ("our juvenile justice system is primarily rehabilitative in nature").

"The rehabilitative purpose of the Juvenile Act is attained through accountability and the development of personal qualities that will enable the juvenile offender to become a responsible and productive member of the community." ***In re R.D.R.***, 876 A.2d 1009, 1013 (Pa. Super. 2005) (quotation marks and citations omitted). This is achieved through various means, including "[p]lacing the child on probation under supervision of the probation officer of the court," "[c]ommitting the child to an institution, youth development center, camp, or other facility for delinquent children," and "[o]rdering payment by the child of reasonable amounts of money as fines, costs, fees or restitution." ***See*** 42 Pa.C.S.A. § 6352(a).

However, the Juvenile Act only applies to individuals who are under the age of 21. ***See*** 42 Pa.C.S.A. § 6302. The Juvenile Court thus loses jurisdiction over the individual when they have "attained the age of twenty-one." Pa.R.J.C.P. 630 ("[w]hen the juvenile has attained the age of twenty-one, the court shall enter an order terminating court supervision of the juvenile"). Delay in holding the adjudicatory hearing can potentially have a negative impact upon the juvenile's rehabilitation, as it lessens the amount of time the juvenile is subject to the "programs of supervision, care and rehabilitation" ordered by the Juvenile Court – and potentially limits the type of treatment that is even available for the juvenile. ***See*** 42 Pa.C.S.A. § 6301(b)(2).

Given the purposes of – and the time constraints inherent in – the juvenile system, we conclude that the ability to be rehabilitated is, for juveniles, an additional "interest[] . . . which the speedy trial right was designed to protect." *See Barker*, 407 U.S. at 532. Therefore, we conclude that the loss of rehabilitative benefits constitutes a colorable basis of concern that a Juvenile Court must weigh in analyzing the "prejudice" prong of *Barker's* balancing test in the context of a delinquency proceeding.

We respectfully conclude that the Juvenile Court erred as a matter of law when it held "Pennsylvania jurisprudence does not hold that [the loss of rehabilitative benefits] is the type of prejudice that makes proceedings fundamentally unfair to a juvenile" for speedy trial purposes. Juvenile Court Opinion, 12/4/24, at 4. Thus, we vacate that particular order and remand this case to the Juvenile Court, so that it may, in the first instance, consider Appellant's claim of prejudice and weigh the relevant factors to assess Appellant's speedy trial claim.[8]

---

[8] Although Appellant has reached the age of majority, his claim on appeal is not moot, as Appellant "was under the age of [21] when the [Juvenile Court] entered its order" and Appellant is still subject to certain aspects of the Juvenile Court's dispositional order, including the 50-year prohibition on his hunting and trapping privileges and the now civil judgment that Appellant must pay as a result of the restitution, fines, and costs ordered by the Juvenile Court. *See* 42 Pa.C.S.A. § 6352(a)(5) ("[a]ny restitution order which remains unpaid at the time the child attains 21 years of age shall continue to be collectible under [42 Pa.C.S.A. §] 9728 (relating to collection of restitution, reparation, fees, costs, fines and penalties)"); 42 Pa.C.S.A. § 9728(a)(1); *see also In re E.F.*, 995 A.2d 326, 332 (Pa. 2010) (holding the issue of "whether the Superior Court erred by concluding that the [Juvenile Court] abused its

*(Footnote Continued Next Page)*

Order denying Appellant's speedy trial claim vacated.  Case remanded.

Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 8/7/2025

---

discretion by denying the Commonwealth's certification petition" to the adult criminal court was not moot, even though the juvenile had turned 21 years old because:  "[the juvenile] was under the age of [21] when the [Juvenile Court] entered its order" and "[i]t is undeniable that [the juvenile] will be affected by the outcome of [the] appeal, as [the Supreme Court's] ruling will determine whether he is prosecuted for sexual assault in adult criminal court").